UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANNE MARIE VARDON, ) | CASE NO. 5:13CV2531 |
| ) | |
| Plaintiff, ) | JUDGE DONALD C. NUGENT |
| ) | |
| v. ) | Magistrate Judge George J. Limbert |
| ) | |
| CAROLYN W. COLVIN,[1] ) | **REPORT AND RECOMMENDATION** |
| ACTING COMMISSIONER OF ) | **OF MAGISTRATE JUDGE** |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

Anne Marie Vardon ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying her application for Supplemental Security Income ("SSI"). ECF Dkt. #1. For the following reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.

## I. PROCEDURAL AND FACTUAL HISTORY

Plaintiff applied for SSI on October 18, 2007, alleging disability since September 17, 2007. The SSA denied Plaintiff's applications initially and on reconsideration. ECF Dkt.#12, Transcript of proceedings ("Tr.") at 144-151. Plaintiff requested an administrative hearing, and on February 22, 2010, the ALJ conducted an administrative hearing *via* video conference and accepted the testimony of Plaintiff, Kathleen Rice, a vocational expert, and Martin Macklin, M.D., a medical expert ("ME"). Tr. at 88-117. On March 19, 2010, the ALJ issued a Decision denying benefits. Tr. at 125-143.

Plaintiff appealed the Decision, and on January 13, 2011, the Appeals Council vacated the Decision and remanded the matter, with instructions that the ALJ: (1) further evaluate Plaintiff's impairments, individually and in combination, and provide rationale consistent with the severity of

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

the impairments, including reference to specific evidence of record, and to provide appropriate work-related functional limitations; (2) further evaluate Plaintiff's subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of symptoms; (3) give further consideration to the treating source opinions and explain the weight given, as well as to request additional evidence or further clarification from the treating sources as appropriate; (4) give further consideration to Plaintiff's maximum residual functional capacity and provide appropriate rationale with specific references to the evidence of record to support the assessed limitations; and (5) obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base. Tr. at 140-143.

A second hearing was held on January 11, 2012. Tr. at 46-87. At the hearing, the ALJ accepted the testimony of Plaintiff, and Mark Anderson, a vocational expert. On February 8, 2012, the ALJ issued a Decision denying benefits. Tr. at 23-45. Plaintiff appealed the Decision, and on September 19, 2013, the Appeals Council denied review. Tr. at 5-8.

On November 15, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On May 9, 2014, Plaintiff filed a brief on the merits. ECF Dkt. #15. On June 6, 2014, Defendant filed a brief on the merits. ECF Dkt. #16. A reply brief was filed on June 19, 2014. ECF Dkt. #17.

**II.**     **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffers from degenerative disc disease of the lumbar and cervical spines, radiculitis of the lumbar spine, thoracic disc degeneration, numbness and tingling of the legs and arms, epilepsy/seizure disorder, right rotator cuff syndrome, somatoform disorder, bipolar disorder, anxiety disorder (NOS) and mood disorder (NOS), which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 25. The ALJ further determined that Plaintiff suffers from the following non-severe impairments: alcohol dependence in remission, cannabis abuse in remission, borderline personality disorder, mitral valve prolapse, dropped bladder, hypothyroidism and fibromyalgia. Tr. at 25. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments

listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 416.920(d), 416.925 and 416.926 ("Listings").  Tr. at 26.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, as defined by 20 C.F.R. § 416.9679(a)[2], except that Plaintiff must be able to sit/stand alternatively, at will.  In addition, the ALJ limited Plaintiff to simple routine repetitive tasks; provided that Plaintiff will not be off task more than ten percent in a work period.  Plaintiff can occasionally use ramps or stairs, stoop, and crouch; she can frequently balance but must never kneel or crawl, and can never be exposed to unprotected heights.  Plaintiff may frequently reach and reach overhead bilaterally, and handle and finger objects bilaterally.  Lastly, the ALJ limited Plaintiff to work that is limited to simple, routine, and repetitive tasks performed in a work environment free from fast-paced production requirements involving only simple work related decisions and routine work place changes. Tr. at 28.

The ALJ ultimately concluded that, although Plaintiff was unable to perform her past work as an assistant manager, office helper, or retail salesperson, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of inspector of wooden products, document preparer, and patcher.  Tr. at 37.  As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### III.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

---

[2]Sedentary work "involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 416.967(a).

> 2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));
>
> 3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));
>
> 4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));
>
> 5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV. STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## V.     ANALYSIS

Plaintiff advances a two arguments in this appeal: Plaintiff contends that the ALJ erred when he did not consider and/or weigh the opinion of Dr. Macklin (the ME who testified at the first administrative hearing), and that the ALJ's decision is not supported by substantial evidence because he did not give substantial weight to the opinion of Plaintiff's treating physician, Magaly Lopez-Csorba, D.O.

### A.     Medical history

Plaintiff sought treatment for several physical problems. On January 4, 2007, Plaintiff underwent an MRI of the cervical spine, due to neck pain and a history of C5-C6 fusion. Tr. at 433. The tests were compared to a previous study dated December 5, 2003. The imaging revealed postsurgical changes with anterior fusion plate and vertebral bodies screws at C5-C6, a mild diffuse disc bulge at C4-C5 resulting in a minimal degree of central canal narrowing, a minimal diffuse disc bulge at C6-C7 with a small superimposed central disc protrusion resulting in no central canal stenosis, bilateral neural foraminal narrowing at C4-C5 secondary to encroaching uncovertebral osteophytes.

On September 17, 2007, Plaintiff reported to the emergency department for right-sided flank pain. Tr. at 421. An MRI showed that Plaintiff had minimal multi-level lower lumbar degenerative disc disease and minimal disc bulging, however, there was no significant central canal stenosis. Tr. at 417. The MRI also showed minimal bilateral neural foraminal narrowing at L4-L5 due to disc bulging and facet joint hypertrophy and multilevel mild lower lumbar facet joint hypertrophy. Tr. at 417-418. Plaintiff was prescribed conservative pain medication and dismissed in stable condition

and relatively free of pain. She was advised to return home and avoid any excessive lifting, bending, and twisting. Tr. at 412.

About a month later, Plaintiff visited Douglas Ehrler, M.D., who reviewed Plaintiff's MRI and concluded that it was within normal limits and there was no stenosis or degenerative discs. Tr. at 449. Plaintiff did not have any pain, numbness, tingling or weakness going down her legs. She could walk on her heels and toes, was able to bend over and touch her toes, had a good range of motion, had a normal gait and normal sensation, and had five out of five strength in L4-5 and L5-S1.

On January 6, 2008, Plaintiff went to the emergency room for acute exacerbation of neck and back pain. Tr. at 490. Upon examination, Plaintiff had reproducible pain on palpation of the paraspinal cervical musculature with some spasms noted and reproducible pain on palpation of the left thoracic musculature. Tr. at 491. Plaintiff's neck, however, was unremarkable and she had no pain on palpation to the cervical spine. Tr. at 490. She also had an active range of motion in all extremities, she was able to flex, extend, abduct, and adduct without difficulty, and she had no pain on palpation of the spinal column. Tr. at 490. She was given a pain shot, as well as prescriptions for Percocet, Flexeril, and ibuprofen, then discharged. Tr. at 491.

On May 18, 2008, Plaintiff returned to the emergency department complaining about back pain. Tr. at 533. She reported no numbness or tingling, nor was there any evidence of sensory deficits or motor loss. Tr. at 533. She was prescribed Vicodin and discharged in stable condition. Tr. at 533-534.

On August 14, 2008, Plaintiff reported to the emergency department again for lower back pain and bilateral leg pain. Tr. at 602. Her physical exam, however, revealed that she had a good stable gait, good strength and sensation to light touch in all four extremities, and good symmetric reflexes. Tr. at 602. Her back revealed no significant tenderness to palpation, nor were there signs of any step-off deformities or crepitus Tr. at 602. X-rays revealed a remote fusion at C5-C6 with degenerative changes at C3-C4. Tr. at 604. Vu Phan, M.D., observed that he did not think she had a spinal cord compression syndrome at that time. Tr. at 602. She was prescribed Dilaudid, Phenergan, and Norflex, and discharged in good condition. Tr. at 602-603.

-6-

A few weeks later, on September 4, 2008, Plaintiff went to the emergency department complaining about having "[p]ain all over." Tr. at 610. She denied any numbness, tingling or weakness to the extremities. Tr. at 610. Upon examination, she had no cervical, thoracic, or lumbar midline spine tenderness. Tr. at 610. Robert Faflik, D.O. opined that Plaintiff did not have a focal deficit that required imaging or diagnostic studies, and that most of her pain was in bilateral upper trapezius tenderness and palpable spasm to the area, but there was no midline spine tenderness. Tr. at 610. Dr. Faflik concluded that Plaintiff was experiencing a chronic exacerbation of her fibromyalgia. A short course of Vicodin and ibuprofen were prescribed to treat her pain. Tr. at 611.

Plaintiff began treatment with Dr. Lopez-Csorba in May of 2008.[3] Tr. at 583. Plaintiff complained of back and neck pain, and her initial diagnoses were fibromyalgia and depression. According to the medical notes, Plaintiff had been sober for sixteen months. Plaintiff treated with Dr. Lopez-Csorba for various medical problems throughout 2008. Tr. at 584-595. On September 8, 2008, Plaintiff experienced a seizure, which was attributed to one of her medications. Tr. at 544, 596. On September 10, 2008, Plaintiff was referred to a pain management clinic. Tr. at 598.

Plaintiff visited Guang Yang, M.D., at Falls Pain Management Center on September 17, 2008. Tr. at 657. After examining Plaintiff, Dr. Yang diagnosed lumbar disc degeneration, lumbar radiculitis, thoracic disc degeneration, cervical disc displacement, and fibromyalgia. Tr. at 659. Plaintiff told Dr. Yang that she did have some decrease in pain occasionally, and her medications alleviated her pain. Tr. at 658. Dr. Yang noted that Plaintiff had a normal gait and good balance. Tr. at 658. She was able to tiptoe and heel walk independently without difficulties. Tr. at 658. On September 29, 2008, Robert Geiger, M.D., administered epidural injections. Tr. at 660-676. In November of 2008, Plaintiff complained about continuing back pain. Tr. at 677. Although she appeared to be in discomfort at her November 14, 2008 appointment, her lower extremity strength was five out of five, she walked with a normal gait, and she had no spinal swelling or deformity. Tr. at 678.

---

[3]In her brief, Plaintiff writes that she began her treatment relationship with Dr. Lopez-Csorba in 2001. Although Dr. Lopez-Csorba's treatment records contain MRI results dating back to 2001, Plaintiff is identified as a new patient on May 22, 2008. Tr. at 583. Likewise, Plaintiff testified at the second hearing that she had been treating with Dr. Lopez-Csorba for two or three years. Tr. at 72.

On December 23, 2008, Plaintiff returned to Falls Pain Management Center and stated that her pain was moderately well controlled at the time and that her neck pain was minimal. Tr. at 689. She was able to raise from a seated position without difficulty, and she ambulated with a normal and steady gait. Tr. at 689. Dr. Geiger instructed her to follow up with Dr. Yang in two months. Tr. at 691.

Dr. Lopez-Csorba wrote a letter on December 12, 2008, in which she opined that Plaintiff's impairments limited her capacity to engage in physical activity that requires prolonged standing, bending, overhead work or lifting. Tr. at 616. Several weeks later, in January of 2009, Dr. Lopez-Csorba ordered an MRI. The January 5, 2009 MRI showed minimal disc bulging without thecal sac or neural foraminal narrowing at T12-L1, L1-L2, and L2-L3. Tr. at 625. The MRI also showed a central disc bulge at L3-L4 flattening the ventral aspect of the thecal sac, with minimal thecal sac narrowing. Tr. at 625. There was also moderate ligamentum flavum and facet hypertrophy as well as neural foraminal disc protrusion or extrusion abutting the underside of the existing right L3 nerve root with at least mild overall right neural foraminal narrowing. Tr. at 625. The MRI showed mild thecal sac narrowing at L4-L5 with posterior element hypertrophy. Tr. at 626.

Notably, in the months following her MRI, although Plaintiff still reported having pain, she informed Dr. Yang and other physicians at Falls Pain Management Center that her quality of life had improved secondary to pain medication. Tr. at 693, 713-717. On April 1, 2009, she reported that her pain level was only four out of ten. Tr. at 716.

On June 22, 2009, Plaintiff underwent a right L3-L4 microdiscectomy. Tr. at 700. The following month, she reported that her pain level was seven out of ten and that her overall pain was only mildly well-controlled at this time. Tr. at 710. However, Jim Bressi, D.O., from Falls Pain Management Center noted that Plaintiff was able to raise from a seated position without difficulty and she ambulated with a mildly antalgic gain that was steady. Tr. at 711.

Although Plaintiff complained about pain in the months that followed, she was able to perform various activities. For example, in July, she still reported that she was able to perform activities of daily living. In September, notwithstanding her complaints of debilitating pain, Plaintiff

-8-

was standing on a table to decorate her apartment. Tr. at 802, 805, 814. She fell from the table and injured her head. Tr. at 802, 805, 814. A CT of her head and x-rays of her cervical spine were negative. Tr. at 806. Although the emergency department physician initially prescribed Percocet, the pharmacist informed the physician that Plaintiff had filled a prescription for Percocet at another pharmacy the previous day. Tr. at 806. Therefore, the physician cancelled the prescription. Tr. at 806.

On December 3, 2008, Plaintiff experienced another seizure, in which she fractured her sacrum. Tr. at 791. On January 6, 2010, Dr. Lopez-Csorba wrote a letter in an effort to help Plaintiff secure new residence[4], in which she opined that Plaintiff's condition limited her ability to carry heavy objects or to be very physically active. Tr. at 914. Dr. Lopez-Csorba further opined that Plaintiff had undergone several medical and emotional setbacks in the previous few months (presumably referring to her seizure and the injuries resulting from the seizure) that "made her homebound and dependent on others for assistance with transportation and chores." Tr. at 914.

In the early months of 2010, Plaintiff continued to seek treatment for her back. She had several MRIs and x-rays of her back. The MRIs showed only mild cord flattening in the midline, with a disc protrusion at T7-T8. Tr. at 892, and degenerative changes at C4-C5 and C6-C7 with moderately severe foraminal stenosis at the right C4-C5 level. Tr. at 911-12.

David Hart, M.D., a spinal neurosurgeon, reviewed Plaintiff's MRI images and noted that they showed a central disc herniation at T7-8 Tr. at 920. Dr. Hart indicated that there was mild flattening of the ventral service of the spinal cord, but absolutely no spinal cord compression, no significant deflection or deviation of the course of the spinal cord at this level, no signal change in the cord and ample cerebrospinal fluid space around and posterior to the cord at this level. Tr. at 920. Dr. Hart opined that Plaintiff was not at undue risk of any type of progressive neurologic dysfunction due to this thoracic disc herniation and was not a candidate for surgical intervention. Tr. at 920.

---

[4]Dr. Lopez-Csorba wrote, "her present home limits her ability to get outdoors, to access facilities and do chores independently, to be more active, or to have a family caregiver overnight if needed. It has also affected her emotionally as she feels increasingly unsafe, afraid for herself and her children, and agitated by the loud noises in the building." Tr. at 914.

On January 27, 2011, Plaintiff returned for pain management at the Center for Pain Medicine at Summa Western Reserve Hospital. Tr. at 1027. James Sable, M.D., examined Plaintiff and noted that she had a normal range of motion of the neck with some moderate to severe paraspinal muscular tenderness. Tr. at 1030. She had severe tenderness in the bilateral paraspinal musculature in the cervical, thoracic, and lumbar spine. Tr. at 1030. She had a mildly limited range of motion in the lumbar spine and a normal gait. Tr. at 1030. Dr. Sable was hesitant to prescribe Plaintiff additional narcotics, however, given her significant history of abusing narcotic medication. Tr. at 1031. Thus, he prescribed Lyrica and, if she did not respond, he informed her that he would refer her to pain rehabilitation at the Cleveland Clinic. Tr. at 1031.

In early 2011, Plaintiff experienced pelvic pain and further diagnostics found she suffered from endometriosis and had a hernia. Tr. at 928-929, 976-977, 992-993, 1019-1026. On July 11, 2011 Plaintiff had a hernia surgery. Tr. at 1005-1010. Plaintiff had subsequent treatments and examinations due to her continued pelvic pain. Tr. at 1015-1016, 1052-1056, 1075-1076, 1201-1204.

From July to September of 2011, Plaintiff went to the emergency department for back pain on several occasions. Tr. at 1011-1013, 1086-1093. An emergency department report from October 13, 2011 states that Plaintiff had some diffuse pain to palpation in the right lumbosacral musculature and some pain in the right sciatic notch area, but her straight leg raises were negative, she had five out of five upper and lower extremity strength, and she had good toe extensor strength. Tr. at 1083. An October 18, 2011 physical examination and EMG report were unremarkable, showing normal motor strength and sensation, negative straight leg raise, and normal motor and sensory latencies, evoked amplitudes, and segmental conductions. Tr. at 1063.

An EMG study on Plaintiff's lower legs was completed on October 18, 2011, which yielded normal results. Tr. at 1063. Plaintiff had a cervical MRI performed on November 4, 2011, which revealed degenerative disc disease at C4-5 with retrolisthesis of C4 on C5, and the radiologist noted that the retrolisthesis is slightly greater than previously diagnosed. Tr. at 1047. Plaintiff experienced another seizure on November 4, 2011. Tr. at 1035.

Another MRI of the cervical spine was completed on December 16, 2011, which showed multiple disc bulges, C4-5 retrolisthesis with effacement of the ventral thecal sac and contact with

-10-

the underlying cord, and mild ventral cord flattening. Tr. at 1095-1096. A lumbar MRI dated March 12, 2012 showed a possible acute Schmof's node on L3 and a mild disc bulge extending into the right neural foramen with mild stenosis. Tr. at 1228.

Plaintiff also suffered from mental disorders for which she sought treatment. On April 8, 2008, Robert Dallara, Ph.D., performed a consultative psychological examination of Plaintiff. Tr. at 503-506. Plaintiff reported to Dr. Dallara that she struggled with feelings of depression and nervousness. Tr. at 504. Dr. Dallara noted that there was no evidence of delusions, paranoia, dissociative experiences, or obsessive-compulsive behaviors. Tr. at 504. He explained that she was alert and oriented as to time, place, person, and situation. Tr. at 505. He noted that her insight and judgment appear to be mildly impaired, although she would have sufficient information, judgment, and common sense reasoning ability to live independently, make important decisions concerning her future, and manage her funds. Tr. at 505.

Plaintiff told Dr. Dallara that she usually woke up at 6:00 a.m. in order to prepare her children for school. Tr. at 505. She would do housework depending on her pain level. Tr. at 505. Plaintiff cooked meals, cleaned, did laundry, and did some of the shopping. Tr. at 505.

Dr. Dallara diagnosed Plaintiff with bipolar disorder and anxiety disorder NOS. Tr. at 506. He opined that Plaintiff's ability to relate to others, including co-workers and supervisors, appeared to be at least mildly impaired. Tr. at 506. He also stated that her ability to understand instructions appeared adequate, while her ability to remember and carry out simple one or two-step instructions may be mildly impaired. Tr. at 506. Her ability to pay attention and concentrate were mildly impaired, but there was no evidence suggesting impairment to her persistence or pace. Tr. at 506. In addition, Plaintiff's ability to withstand stress and pressure associated with day-to-day work seemed mildly impaired. Tr. at 506.

About a month after visiting Dr. Dallara, state agency psychological consultant Bonnie Katz, Ph.D., reviewed the evidence of record at the initial level of administrative review. Tr. at 512-24. Dr. Katz concluded that Plaintiff did not have a severe mental impairment. Tr. at 524. Specifically, she found that Plaintiff had mild restrictions of activities of daily living, mild difficulties maintaining

social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of extended duration. Tr. at 522.

Dr. Lopez-Csorba observed on March 17, 2009 that Plaintiff's depression was well controlled with samples of Cymbalta. Tr. at 826. In April, however, Plaintiff reported to the emergency department with feelings of being out of control, agitation, and rage. Tr. at 696. Anthony Smartnick, M.D., examined Plaintiff and diagnosed her with depressive disorder (rule out bipolar disorder) and a possible borderline personality disorder. Tr. at 698. Dr. Smartnick noted, though, that there was no evidence of delusions, hallucinations or other psychotic features, her thought process was logical, coherent and well organized, her memory and attention were intact, and her judgment and insight were generally intact. Tr. at 697-98. Notably, Dr. Smartnick also indicated that Plaintiff's chronic pain was stable on her pain management and pain medications. Tr. at 697. He gave her several medications, including Klonopin and Seroquel, which stabilized her mood. Tr. at 747.

On September 16, 2009, Rajeev Mehta, D.O., performed a psychiatric evaluation. Tr. at 917-918. Dr. Mehta indicated that Plaintiff complained of anger problems, impatience, and a very low tolerance for frustration. Tr. at 917. He noted that she had no suicidal or homicidal ideation, delusions, or hallucinations. Tr. at 918. Dr. Mehta diagnosed her with mood disorder NOS and prescribed Zoloft and Klonopin. Tr. at 918.

On December 23 2009, Plaintiff was admitted to the hospital after overdosing on drugs. Tr. at 893. Her drug screen revealed benzodiazepines, opioids, and THC. She was discharged the following day with Lamictal X and Flexiril. At the time, Plaintiff was also taking Motrin for her chronic back pain. She visited Dr. Mehta the following month, and he indicated that Plaintiff was cooperative, her affect was stable, although depressed, her judgment was adequate, her impulse control was fair, and she did not have any delusions, hallucinations, or suicidal or homicidal ideation. Tr. at 915.

On October 3, 2011, Plaintiff visited a psychiatrist, Sharad Bhatt, M.D., where she reported suffering from panic attacks and anxiety. Tr. at 1077-1082. She followed up with Dr. Bhatt on week later. Tr. at 1076. Although Plaintiff was very anxious, Dr. Bhatt also noted that Plaintiff was calm,

-12-

alert, cooperative, she had no pressured speech, and had no flight of ideas. Tr. at 1076. He increased her prescriptions for Zoloft and Klonopin. Tr. at 1076.

### B.      Hearing testimony

At the hearing, Plaintiff testified that she was thirty-seven years old, single, and that she lived with her two daughters in an apartment. Tr. at 53-54. She graduated from high school. Tr. at 248. Her prior work experience included working as a cashier and as an assistant manager in retail sales. Tr. at 277.

Plaintiff's mother shops for Plaintiff's groceries because Plaintiff cannot drive for six months after she has a seizure. Tr. at 54. Plaintiff testified that her first seizure was at the end of 2008 or the beginning of 2009, and her most recent seizure was six months before the hearing. Tr. at 62, 54. Plaintiff testified that she missed working, but that she loses her balance all the time. Tr. at 55. Her last job was at Panera Bread Company, where she started having seizures and experiencing amnesia, so she could no longer work. Tr. at 56.

Plaintiff receives food stamps and child support, as well as medical insurance through job and family services. Tr. at 57. She experiences good days, when she is able to do some light house cleaning, and bad days, when she is bedridden. Tr. at 57-58. Plaintiff's pain prevents her from sleeping at night. Tr. at 58. She testified that her pain is "all over," and she drops things because her arms go numb. Tr. at 59.

When asked by the ALJ to explain why she cannot work, Plaintiff described her inability to stand and walk, lift, twist, and turn. Tr. at 60. Plaintiff explained that the surgery on her lumbar spine was supposed to reduce her pain, but that her back pain has increased since the surgery. Tr. at 62. She cannot stand in a grocery line. Tr. at 64. Plaintiff testified that her problems are worsening, which causes her depression. Tr. at 60. Plaintiff also attributed her depression, anxiety, anger, and post-traumatic stress disorder to abuse she suffered as a child and a young adult. Tr. at 66.

Plaintiff testified that she takes prescribed medication for her seizure disorder and her anxiety, but that she is not regularly-prescribed pain medication. Plaintiff seeks treatment at the emergency room when her pain is too much to bear. Tr. at 67. She visits the emergency room once

per month. Tr. at 69. She conceded that she suffers from alcohol dependency and described her marijuana use as "self-medicat[ion]." Tr. at 68-69.

### C. The ALJ's decision

In concluding that Plaintiff was not disabled, the ALJ relied upon the multiple MRIs conducted during the relevant time frame, many of which revealed only mild or minimal disc disease. Likewise, Plaintiff reported diminished pain with medication. Tr. at 31. The ALJ also relied upon the fact that Plaintiff does not use narcotic pain mediation, and, although she has undergone treatment, she did not follow through with several pain specialists. The ALJ did not credit Plaintiff's testimony with respect to debilitating pain. The ALJ asserted that the degree of pain alleged by Plaintiff would "immobilize any ordinary person," but that it did not prohibit her from preparing her children for school. Tr. at 34. Finally, the ALJ called into question Plaintiff's contradictory statements in the record regarding alleged childhood abuse.

### D. Opinion evidence

Plaintiff contends that the ALJ did not consider the opinion of the ME that testified at the first hearing and also failed to give appropriate weight to the opinion of Dr. Lopez-Csorba. An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007. If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013. The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed

-14-

controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

Finally, an ALJ need not discuss every piece of evidence in the administrative record so long as he considers all of a claimant's medically determinable impairments and his opinion is supported by substantial evidence. See 20 C.F.R. § 404.1545(a)(2); see also *Thacker v. Comm'r of Soc. Sec.*, 99 Fed.Appx. 661, 665 (6th Cir.2004). Substantial evidence can be "less than a preponderance," but must be adequate for a reasonable mind to accept the ALJ's conclusion. *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, 854 (6th Cir.2010) (quotation omitted).

At the first hearing, the ME testified that Plaintiff either met Listing 12.07 (somatoform disorders) or 1.04 (disorders of the spine). Dr. Macklin testified, "The records really don't give me good guidance as to which of those to say is more prominent. But I think I could say that she met either of those. Not both, obviously, but either." Tr. at 107.

Plaintiff carries the burden of proving that her impairments meet or equal a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). The Listings "were designed to operate as a presumption of disability that makes further inquiry unnecessary" and, consequently, require a higher level of proof than the statutory standard for disability. *Id.* at 532-33. Thus, for a claimant to meet that heavy burden, he or she must show the impairment "meet[s] all of the specified medical criteria." *Id.* at 530 (emphasis in original). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Id.* The issue of whether a claimant meets the requirements of a Listing, like the ultimate issue of disability, is not a medical determination but rather a dispositive administrative finding reserved to the Commissioner. 20 C.F.R. § 416.927(e).

The ALJ did not address Dr. Macklin's testimony from the first hearing in the Decision. As a matter of initial concern, it is important to note that, although Dr. Macklin is a medical doctor, his specialty is psychiatry and his secondary specialty is chemical dependency. Tr. at 175. Of equal import, Dr. Macklin conceded at the hearing that he was not certain whether Plaintiff met or equaled the Listings at 12.07 or 1.04. Throughout his testimony he also acknowledged that the medical evidence with respect to both Listings was inconsistent. For instance, with respect to Listing 12.07,

Dr. Macklin declined to accept the fibromyalgia diagnosis because Plaintiff had not seen a rheumatologist. Tr. at 106-107. Dr. Macklin also recognized stark inconsistencies in the record involving Plaintiff's spinal problems. In fact, he acknowledged that several examinations – including an examination by a well-respected physician – yielded normal results. Tr. at 106, 109. With respect to Listing 1.04, Dr. Macklin testified, "Unfortunately, we don't have good physical findings in terms of a physical exam. You can't make a diagnosis based on the films. They would be supportive of a physical finding." Tr. at 109.

In the original Decision, the first ALJ provided the following analysis of Dr. Macklin's testimony:

> At the hearing, Dr. Macklin testified that the claimant has not seen a rheumatologist for a firm diagnosis of fibromyalgia and there is no good diagnostic descriptor of the checklist for fibromyalgia. He stated that if that is what her difficulty is, it would satisfy the confusion why some of her symptoms wax and wane and that would be under listing 1.04. . .In terms of 12.04, Dr. Macklin stated that her pain and difficulties increase those symptoms. Dr. Macklin vaguely opined that she either meets 12.07 or 1.04 of the Listings. He stated that the record is somewhat confusing.
>
> I do not find evidence supporting Dr. Macklin's opinion. Under 12.07, Somatoform Disorders, there is no evidence of marked restriction in the "B" criteria, under 1.04, Disorders of the Spine there is no evidence of motor loss, sensory or reflex loss, spinal arachnoiditis or pseudoclaudication, therefore, I give minimal weight to his opinion that the claimant meets a listing. Such a lack of evidence also leads me to eliminate a finding of equaling listings.

Tr. at 132. Although the Appeals Council reversed the original Decision, the Council provided no instruction on remand that the ALJ should reconsider or re-weigh Dr. Macklin's testimony, as it did with respect to Dr. Lopez-Csorba.

Dr. Macklin is a non-examining physician, who acknowledged at the first hearing that his conclusions – which he provided in either/or form – were not supported by an admittedly inconsistent record. Here, the ALJ carefully considered whether Plaintiff met or equaled both

-16-

listings at issue.[5] Accordingly, the undersigned recommends that the Court find that the ALJ did not err in not crediting the opinion of the ME.

Turning to Dr. Lopez-Csorba, the ALJ provided the following analysis of the two letters written by her in the record:

> On December 12, 2008, Dr. Lopez-Csorba noted that because of seizures and the use of opioids that can sometimes cause [Plaintiff] to be somnolent or distracted, [Plaintiff] is restricted from driving, using machinery or engaging in situations where a potential seizure could cause injury to herself or others. Dr. Lopez also found that [Plaintiff's] problems limit her capacity to engage in physical activity that requires prolonged standing, bending, overhead work or lifting (16F). I give portions of the opinion of Dr. Lopez great weight and have incorporated her findings into the residual functional capacity found herein. Specifically, I have added a sit/stand option and have limited her to occasional bending and crouching. however, the record does not show that [Plaintiff] complained of a level of side effects from medication that Dr. Lopez noted. Moreover, I note that [Plaintiff] is no longer using opioid medications, as such, the alleged side effects are no longer a concern. Consequently, I give her opinion little weight.

---

[5]Specifically, with respect to Listing 1.04, the ALJ found that there was no evidence that Plaintiff had "any compromise of a nerve root or the spinal cord," which was well documented by the record. Tr. at 26, 412, 417-18, 449, 490-91, 533, 602, 610, 806, 920. Nor did the record show that Plaintiff had any "root compression, spinal arachnoiditis or lumbar spinal stenosis accompanied by sensory or reflex loss of an inability to ambulate effectively." Tr. at 26, 412, 417-18, 449, 490-91, 533, 602, 610, 806, 920, 1063, 1083 (ALJ referring to criteria in 1.04(A)-(C)). As the ALJ pointed out, although two MRIs showed mild cord flattening and compression at T7-T8, Tr. at 26, citing Tr. at 575, 892, Plaintiff did not exhibit any neurological defect, as required by Listing 1.04. Tr. at 26, citing Tr. at 920. Moreover, the ALJ pointed out that Plaintiff was ambulatory which, in addition to the other evidential shortcomings, further confirmed that she did not meet Listing 1.04. Tr. at 26, 449, 490-91, 602, 658, 689, 1117 (showing Plaintiff was ambulatory, had a good range of motion, and had a normal gait).

With respect to Listing 12.07, a claimant must prove that his or her mental impairments result in at least two of the following: (1) "[m]arked restriction of activities of daily living," (2) "[m]arked difficulties in maintaining social functioning," (3) "[m]arked difficulties maintaining concentration, persistence, or pace," or (4) "[r]epeated episodes of decompensation, each of extended duration." 20 C.F.R. Pt. 404,Subpt. P, App. 1. The ALJ found that Plaintiff did not satisfy any of these criteria.

Relying on Plaintiff's own statements, the ALJ explained that Plaintiff was mildly, not markedly, restricted in performing activities of daily living, given that she was able to perform personal care, cook meals, clean, drive a car short distances, shop, pay bills, handle her finances, and get her children ready for school . Tr. at 27, 301-02, 505, 522, 524. She also had mild difficulties in social functioning; she spent time with others on the phone, her family visited her at times, and she had attended AA meetings close to home. Tr. at 27, 301-02, 505, 522, 524. The ALJ found she had moderate difficulties in concentration, persistence, or pace because she stated she did not handle stress well, had some memory problems, and had difficulty with a number-counting exercise. Tr. at 27, 306, 505. Finally, the ALJ explained the record did not show that Plaintiff had repeated episodes of decompensation, each for an extended duration. Tr. at 27, 503-06, 522, 524, 915, 1076. Because Plaintiff was not markedly limited in any of these areas or have repeated, extended decompensation episodes, the ALJ concluded she did not meet Listing 12.07. Tr. at 27.

-17-

> On January 6, 2010, Dr. Lopez reported that over the last few months, [Plaintiff] suffered several medical and emotional setbacks that have made her homebound and dependent on others for assistance with transportation and chores. She also noted that her medical problems limit her ability to carry <u>heavy</u> objects or to be <u>very physically active</u>. Then she notes that [Plaintiff] <u>may</u> also require 24-hour supervision by family at times when her condition relapses. She also notes that her present home and noises agitate her. The letter is specifically drafted in an attempt to see if [Plaintiff] is able to get different housing. In addition, the letter is vague and is not supported by any medical evidence whatsoever. However, I have considered the limits of not lifting heavy objects and I agree. Therefore, I have limited [Plaintiff] to sedentary work, which would satisfy the limits of not being able to be very physically active. Consequently, I give those limitations great weight. However, with respect to the 24-hour care/supervision, I find this limitation to be excessive and not supported by the evidence. While this may be related to her seizure disorder, she does not experience seizures to a degree that would warrant this level of care every day. Further, at the hearing, [Plaintiff] noted that she does drive "very seldom" and her Mother does "most of the shopping" (Hearing). Consequently, I give that portion of her opinion little probative weight.

Tr. at 35.

Plaintiff contends that the Decision is not supported by substantial evidence because it is at odds with Dr. Lopez-Csorba's conclusions. Insofar as she is the only treating physician in the record to provide an opinion regarding Plaintiff's physical limitations, Plaintiff contends that her opinions are uncontroverted and, therefore, should be afforded controlling weight.

The "[r]esponsibility for deciding residual functional capacity rests with the ALJ," not a physician. *Vlach v. Comm'r of Soc. Sec.*, No. 12-2452, 2013 WL 3766585, at *12 (N.D. Ohio July 16, 2013) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)); accord 20 C.F.R. § 416.946(c) (the ALJ "is responsible for assessing your residual functional capacity"); *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide."). To determine an individual's RFC, the Commissioner will review "all of the relevant medical and other evidence" in the record, which may include, but is not limited to, medical source opinions. 20 C.F.R. § 416.945(a)(3).

Here, the ALJ included all of Dr. Lopez-Csorba's limitations into the RFC, to the extent that they were supported by the record. The ALJ correctly disregarded Dr. Lopez-Csorba's observations regarding the effect of opioid medication since Plaintiff was no longer prescribed narcotic pain medication. Similarly, the ALJ gave little weight to Dr. Lopez-Csorba's opinion that Plaintiff needed 24-hour care as that assessment was not supported by the record as a whole, and appears to have

-18-

been limited to the months following the seizure that resulted in a fractured sacrum. The ALJ also recognized Plaintiff's inability to lift heavy objects and to be very physically active when he limited her to sedentary work. Plaintiff appears to concede that the ALJ properly integrated Dr. Lopez-Csorba's opinions regarding the foregoing limitations in the RFC. ECF Dkt. #17 at p. 6 ("Are the majority of the RFC limitations reasonable? Maybe.")

As a consequence, Plaintiff relies on two parts of the RFC – frequent reaching and being off task less than ten percent of the work day – to conclude that the ALJ's Decision is not supported by substantial evidence. Plaintiff writes, "[N]o physician stated that Plaintiff could perform work at the sedentary level, use her upper extremities in a frequent manner, or that she would not be off task more than 10%." ECF Dkt. #15 at p. 14.

However, Plaintiff misunderstand that it is within the ALJ's power to fashion the RFC, based upon his review of the medical record. Moreover, Plaintiff fails to cite any evidence in the record, other than Plaintiff's diagnosis of right rotator cuff syndrome and numbness and tingling in the arms, to contravene the ALJ's conclusions regarding the RFC. However, a mere diagnosis does not indicate how that impairment may or may not manifest into work-related functional limitations. See *Despins v. Comm'r of Soc. Sec.*, 257 Fed. Appx. 923, 930 (6th Cir.2007) ("The mere existence of those impairments, however, does not establish that Despins was significantly limited from performing basic work activities for a continuous period of time."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir.1988) (*per curiam*) ("mere diagnosis of arthritis ... says nothing about the severity of the condition").

## **VI.    CONCLUSION**

For the foregoing reasons, the undersigned recommends that the Court AFFIRM the ALJ's decision and dismiss Plaintiff's case with prejudice.


DATE: January 22, 2015

                                  */s/George J. Limbert*
                                  GEORGE J. LIMBERT
                                  UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this notice. Fed. R. Civ. P. 72; L.R. 72.3. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).